IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. CR-12-166-D |
| | ) | |
| MICHAEL JAY HOOD, | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER**

This matter comes before the Court upon Defendant Michael J. Hood's Motion to Suppress Evidence Obtained as a Result of an Illegal Arrest, Search and Seizure [Doc. No. 17], filed pursuant to Fed. R. Crim. P. 12(b)(3)(C), and opposed by the government. On September 27, 2012, the Court held an evidentiary hearing at which Defendant appeared personally and through his appointed counsel, Paul Antonio Lacy and Elliott C. Crawford. The government appeared through Assistant United States Attorney Edward J. Kumiega. The Court heard the testimony of witnesses, and received the following exhibits: Government's Exhibits Nos. 1 through 21; and Defendant's Exhibit No. 1. The witnesses were three officers of the Oklahoma City Police Department (OCPD): Matthew Martinez; Jason Bussert; and John Lambert. The parties presented oral arguments and adopted their written briefs. Upon consideration of the evidence, the case record, and the parties' arguments, the Court finds and rules as follows on Defendant's Motion.

Defendant moves to suppress physical evidence and incriminating statements that may be offered by the government to prove Count 1 of the Superseding Indictment, which charges that on March 14, 2012, Defendant knowingly possessed a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1). The firearm was seized from a jacket worn by Defendant on that date,

when he was detained by Officer Martinez and frisked by Officer Lambert. These officers testified at the hearing concerning the events leading up to their contact with Defendant. Lieutenant Bussert provided information concerning the area of Oklahoma City in which the events occurred, based on crime statistics and data analysis that he routinely performs as part of his employment. The testimony given and exhibits sponsored by these witnesses established the following facts pertinent to Defendant's Motion, as found by the Court.

**Findings of Fact**

Officers Martinez and Lambert are experienced detectives assigned to OCPD's burglary investigation unit. They were working as partners on March 14, 2012, investigating a rash of residential burglaries in a particular neighborhood. Officer Martinez, who had spent eight years as a patrol officer, was familiar with this area of northwest Oklahoma City from his assignment as a patrolman. The testimony of Lt. Bussert, as well as the facts known to Officers Martinez and Lambert, plainly establish that the events occurred in a high-crime area.

On March 14, 2012, Officers Martinez and Lambert went to an apartment complex located at 2909 N.W. 31st Street, known as Hunter's Landing Apartments, as part of their investigation. A cellular telephone associated with an individual named Randy Milton had been found inside a burglary victim's residence, and the officers' investigation led them to believe Mr. Milton was living in the apartment complex. The complex consists of a single building located on the north side of 31st Street with interior apartments located on each side of a central foyer area. The building faces south toward 31st Street and has an elevated wooden deck or porch area in front. The deck is surrounded by a wooden railing, except one side has steps leading from the ground up to the deck and an entry door into the foyer. The foyer has two outside doors located on opposite sides of the

2

building, the front door to enter from the south and another door on the north that opens into a courtyard area and a parking lot.

Upon their arrival at the apartments, Officers Martinez and Lambert observed a number of residents or visitors outside. It was an unseasonably warm day, and people were dressed in shorts and short-sleeved shirts. Officer Martinez believes it was approximately 80 degrees. The officers were not wearing uniforms or driving a marked car, but they wore badges and visible weapons from which they could be identified as law enforcement officers.

The officers spoke to a woman who identified herself as the manager or acting manager of the apartments. She recognized a photograph of Mr. Milton that officers showed her, and stated he lived in No. 108. The woman directed the officers to the door of No. 108, which is located on an enclosed, internal hallway on the ground floor connected to the foyer area. The officers knocked on the door of No. 108 and announced themselves as police. No one answered, but the officers heard noises suggesting movement by someone inside the apartment, perhaps more than one person. Officer Lambert attempted to speak to the person or persons behind the door, but received no response.

The officers then talked to other tenants regarding No. 108. A person who identified himself as a next-door neighbor provided information about a car driven by Mr. Milton and another person. The officers were also told that two people lived in No. 108. The car described by neighbors was parked in the parking lot of the complex. Upon investigation of the car, the officers found that it had been reported stolen. A wrecker service was called to unlock and impound the car. Inside the vehicle, the officers found a checkbook belonging to the burglary victim. During their activities

3

regarding the car, which lasted about 30 minutes, the officers were unable to observe No. 108. Also during that time, a number of people had gathered, curious about what was happening.

While Officer Lambert was inventorying contents of the car, Officer Martinez returned to the area of the apartment complex where he could see No. 108. Officer Martinez was accompanied by another OCPD officer who had arrived to assist them, Officer Greeson. The detectives planned to secure the area while they obtained a search warrant for No. 108. As Officer Martinez approached the building from the north, he was met by an excited onlooker who yelled that someone was running from No. 108. Because the only exit from No. 108 requires passing through the foyer area, Officers Martinez and Greeson ran to the north door of the foyer. As they entered, they saw that the south door appeared to be closing, as if someone had just exited through it. Also, a person in the foyer pointed to the door as if to say, "there he goes." No one was visible through plate-glass windows beside the door, and Officer Martinez did not see anyone pass in front of the window toward the stairs, so he assumed the person who had exited was running quickly. In pursuit of the runner, Officers Martinez and Greeson ran across the foyer and through the south door onto the front porch.

Once outside, the officers saw only one person near the stairs, which is the only exit from the deck without going over the railing. Officer Martinez later determined the person to be Defendant, but he knew at the time the person was not Mr. Milton because of obvious differences in appearance. Defendant was standing at the foot of the stairs facing away from the officers and slightly toward the building, with his back toward the street. Due to the presence of a raised concrete structure that protrudes from the front of the building near the stairs, Defendant appeared to be facing into a corner that was created by the structure's connection to the front wall of the

4

building. Defendant was wearing a bulky, winter-type jacket of waist length. He was looking down at his jacket and moving his arms in quick motions in front of his body, where the officers could not see his hands. Officer Martinez demonstrated the arm movements during his testimony, with his back toward the Court to portray what he saw as he approached Defendant. It would reasonably appear, and it appeared to Officer Martinez at the time, that Defendant was trying to hide or retrieve something inside his jacket. From his police experience, Officer Martinez assumed that Defendant was armed and handling a weapon; the officer perceived it to be a dangerous situation.

While still running toward Defendant, Officer Martinez drew his weapon, pointed it at Defendant, and yelled a command for Defendant to "get on the ground." Defendant attempted to comply. He lowered himself to the ground with his hands in front of him, but he did not lie prone and appeared to Officer Martinez to be trying to keep his hands under his body. Officer Martinez continued to order Defendant to lie flat on the ground, but Defendant did not fully comply with this command and said something was beneath him. From experience, Defendant's behavior gave Officer Martinez further cause to believe that Defendant was trying to hide something, probably a weapon.

As Officer Martinez was descending the stairs, Officer Lambert was rounding the corner of the building, coming from the parking lot. Officer Lambert's first view of the scene was Officers Martinez and Greeson with guns drawn and pointed at Defendant, commanding him to get on the ground. Officer Lambert saw Defendant go toward the ground, but also observed that Defendant would not lie fully prone and said there was something underneath him. Officer Greeson handcuffed Defendant for the officers' safety. Officer Lambert asked Defendant if he had a gun, and he said, "I don't know." Officer Lambert frisked Defendant and his coat, which was a reversible jacket with

5

multiple pockets on both sides. Officer Lambert found a full-sized pistol in a right front, inside pocket. Defendant agreed to talk to the officers, and he was arrested for unlawful possession of a firearm.

### Conclusions of Law

The government bears the burden of proof under circumstances involving a warrantless seizure. *See Florida v. Royer*, 460 U.S. 491, 500 (1983); *United States v. Herrera*, 444 F.3d 1238, 1242 (10th Cir. 2006). In this case, the government contends Defendant's initial seizure was an investigative detention, or *Terry* stop, permitted under *Terry v. Ohio*, 392 U.S. 1 (1968). To determine whether such a detention was constitutionally permitted, courts ask both "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id*. at 20. "A law enforcement officer may stop and briefly detain a person for investigative purposes 'if the officer has a reasonable suspicion . . . that criminal activity may be afoot.'" *United States v. Soto-Cervantes,* 138 F.3d 1319, 1322 (10th Cir. 1998) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "An officer must be able to point to 'specific and articulable facts' to support a finding of reasonable suspicion; an 'inchoate and unparticularized suspicion or "hunch"' is insufficient." *Id*. (quoting *Terry*, 392 U.S. at 21). "Whether an investigative detention is supported by an objectively reasonable suspicion of illegal activity does not depend on any one factor but on the totality of the circumstances." *Id*. (internal quotation omitted).

In this case, the police officers' detention of Defendant, if it was a *Terry* stop, was plainly supported by reasonable suspicion, based on specific and articulable facts suggesting criminal activity. These include that the officers had probable cause to believe stolen property or other

6

evidence of a burglary would be found in a particular apartment, that a person fled from the apartment in an effort to evade a police investigation, that Defendant might be the fleeing person, and that Defendant was attempting to hide something, possibly a weapon, while running from police in a high crime area. Such unprovoked flight and evasive behavior provide sufficient reasons for police officers to stop a person and investigate further. *See*, *e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000).

The question presented, however, is whether Defendant's seizure should be characterized as a *Terry* stop or a full arrest, effectuated by officers with guns drawn, orders to lie down, and handcuffs. The answer to this question is fact-specific and depends on the circumstances. In *Morris v. Noe*, 672 F.3d 1185 (10th Cir. 2012), for example, the court of appeals determined that police officers arrested a man when they tackled, physically restrained, and handcuffed him because this was "an unreasonable level of force" under the circumstances. The court reasoned:

> "[T]he use of firearms, handcuffs, and other forceful techniques does not *necessarily* transform a *Terry* detention into a full custodial arrest." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) (emphasis added). But we have said such techniques "*generally* exceed the scope of an investigative detention." *Cortez* [*v. McCauley*], 478 F.3d [1108] at 1116 [(10th Cir. 2007) (en banc)] (emphasis added). Officers may restrain an individual in order to "maintain the status quo during the course of a *Terry* stop." *Gallegos v. City of Colo. Springs*, 114 F.3d 1024, 1031 (10th Cir. 1997) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). We have approved both a takedown and the use of handcuffs during the course of a *Terry* stop, where the officers reasonably feared for their safety. *See*, *e.g.*, *Id*. at 1030–31 (arm-bar takedown); *United States v. Albert*, 579 F.3d 1188, 1194 (10th Cir. 2009) (handcuffs).

*Id*. at 1192. In *Morris*, the court determined that the person seized "presented no threat to officer safety and had not engaged in any suspicious activity" and the detention was not intended to merely maintain the status quo in the situation. *Id*.

7

Similarly, in *Melendez-Garcia*, the court of appeals found that an arrest occurred when law enforcement officers made a traffic stop in a drug trafficking investigation, where the officers approached two cars with guns drawn, ordered the occupants to get out one at a time, handcuffed and frisked each person, and placed them in separate patrol vehicles restrained by seatbelts. The court concluded that "the naked fact that drugs are suspected will not support a per se justification for use of guns and handcuffs in a *Terry* stop," where there is no evidence that the police had reason to believe "the suspects had guns or were violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing the defendants during the *Terry* stop." *Melendez-Garcia*, 28 F.3d at 1052-53. The reasoning behind this conclusion is instructive:

> We have held in the past that the use of firearms, handcuffs, and other forceful techniques does not necessarily transform a *Terry* detention into a full custodial arrest – for which probable cause is required – when "the circumstances reasonably warrant such measures." [*United States v.*] *Perdue*, 8 F.3d [1455] at 1463-64 [(10th Cir. 1993)]. Thus, in *Perdue* we found that officers acted reasonably when they ordered the occupants out of a car at gunpoint and forced them to lie on the ground when the police had information to suggest that the suspects might be armed, it was late at night in a remote area, and there were only two officers. 8 F.3d at 1463 ("Although effectuating a Terry stop by pointing guns at a suspect may elevate a seizure to an arrest in most scenarios, it was not unreasonable under these circumstances . . . [T]he officers had reason to be concerned for their safety. . . ."). In *United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993), we concluded that officers' display of firearms and use of handcuffs was reasonable when they were informed that the suspect had threatened to kill someone and they observed the suspect violently pounding his fists in his truck. In *United States v. Merritt*, 695 F.2d 1263, 1273–74 (10th Cir. 1982), *cert. denied*, 461 U.S. 916 (1983), the police acted reasonably when they pointed a shotgun at the suspect when they had reason to believe that he was a murderer and heavily armed. However in [*United States v.*] *King*, [990 F.2d 1552 (10th Cir. 1993),] we found that an officer acted unreasonably when she drew her gun and had other officers handcuff the defendant when she noticed that the defendant, who was only creating a traffic disturbance by honking his horn, lawfully had a weapon in the car. 990 F.2d at 1563.
>
> In this case, the government does not try to elaborate why it believes the quantum of force used to secure Melendez, Perez, and Angel was reasonable. The officers did testify in the suppression hearing that they tried to separate the cars and

8

>the suspects in order to promote safety and that they restrained the suspects to "make it safe." However, they gave no reasons why the circumstances of the stop reasonably necessitated the display of firearms and the use of handcuffs.

*Melendez-Garcia*, 28 F.3d at 1052.

Unlike *Melendez-Garcia*, the Court finds in this case that the government has met its burden of showing that, "under the totality of the circumstances, the intrusiveness of this seizure was reasonably necessary for officer safety." *Id*. at 1052-53. Officer Martinez's split-second decision to stop Defendant for investigation as the most likely person to be fleeing from Apartment No. 108, and under the circumstances of a high-crime area, numerous bystanders, and Defendant's behavior suggesting possession of a weapon, the use of protective measures was warranted by the officers' objectively reasonable concern for safety. A drawn weapon and verbal commands to get on the ground were reasonably necessary to neutralize a dynamic and potentially volatile situation and gain control of Defendant's movements. The use of handcuffs and a frisk for weapons was appropriate to maintain the status quo when Defendant did not comply with officers' instructions to lie flat. In short, the Court finds that the facts available to officers on the scene "would warrant a man of reasonable caution in the belief that the action taken was appropriate." *Melendez-Garcia*, 28 F.3d at 1052 (internal quotation omitted).

For these reasons, the Court finds that the level of force used by the officers was reasonably necessary in order to accomplish an investigatory detention of Defendant. Further, the facts discovered during the detention – a concealed handgun in Defendant's pocket – provided probable cause for his subsequent arrest. Accordingly, the Court finds no Fourth Amendment violation occurred, and no unconstitutional conduct that caused the pistol to be discovered or Defendant's subsequent statements to be made.

**Order**

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress Evidence Obtained as a Result of an Illegal Arrest, Search and Seizure [Doc. No. 17] is DENIED.

IT IS SO ORDERED this 4th day of October, 2012.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE